**ORTHMAN MANUFACTURING, INC., Plaintiff,**

v.

**CHROMALLOY AMERICAN CORPORATION, Defendant.**

**No. 79–4043.**

United States District Court, C. D. Illinois.

May 4, 1981.

Edmund J. Sease and Bruce W. McKee, Des Moines, Iowa, John M. Telleen, Rock Island, Ill., for plaintiff.

William H. Dailey, Moline, Ill., Morgan L. Fitch, Jr., and Richard L. Wood, Chicago, Ill., for defendant.

## OPINION, FINDINGS, CONCLUSIONS, AND ORDER FOR JUDGMENT

ROBERT D. MORGAN, Chief Judge.

This is a suit for patent infringement. Plaintiff, a Nebraska corporation, is a relatively small manufacturer of farm implements, with emphasis upon the manufacture of an implement commonly referred to as a tool bar. It is the owner of the two patents in suit, namely, Orthman U. S. Patents numbered 3,774,693, issued November 27, 1973, and 3,941,194, issued March 2, 1976. The claims in issue of both patents relate to the structure of a hydraulically foldable tool bar.

The defendant is a national conglomerate corporation. The accused products were manufactured by defendant's Kewanee, Illinois, Division and its Burch Division. The latter was merged with the Kewanee Division after the complaint in this case was filed. The accused products are the Kewanee 470 rotary hoe and the Burch 608 row crop cultivator. The latter implement is also manufactured and marketed as the Kewanee 3000 row crop cultivator. Hereinafter, those devices are referred to as K470, B608, and K3000, respectively.

Plaintiff alleges that each of those products infringes claims 9 and 10 of its 963 patent and claims 11, 12 and 13 of its 194 patent. Defendant asserts that the patents are invalid for divers reasons. It also denies infringement.

Following a bench trial, which produced an extensive evidentiary record, both parties have submitted proposed findings of fact and conclusions of law and post trial briefs. The cause is now before the court for disposition on the merits.

*Admissibility of Defendant's Exhibit 26*

Defendant's Exhibit 26 (DX26), a German patent application, No. 1,557,674, is one of

the numerous references offered in evidence by the defendant as prior art. Plaintiff objected to that exhibit as not being prior art, contending that the information contained in the exhibit was not published until after the claimed invention was made. The exhibit was admitted at trial, subject to that objection. Plaintiff stands upon that objection in its post-trial presentation, necessitating a determination as to admissibility.

That application was first published in the Federal Republic of Germany on November 26, 1970. The application which led to the 693 patent was filed by Henry Orthman on December 23, 1970. The 194 application, which was co-pending with the 693 application, was filed on November 27, 1973, before the 693 patent issued. Plaintiff accurately frames the decisive question upon which admissibility of DX26 depends, to-wit: "When did Henry Orthman make his invention?" The answer to that question is dispositive of the question of the admissibility of DX26 as to both the 693 and the 194 patents. A comparison of the two patents demonstrates that the original application, which ultimately ripened into the 693 patent, fully disclosed the subject matter of the 194 patent, which issued as a continuation-in-part of the 693 application. Plaintiff is therefore entitled to the benefit of a single time of invention as to both patents. *Technicon Instruments Corp. v. Coleman Instruments Corp.*, 385 F.2d 391, 393 (7th Cir. 1967). DX26 is either prior art as to both patents or it is prior art as to neither of them.

The court finds that Mr. Orthman conceived the claimed invention in the spring of 1970, some months prior to the publication of the German application. The objection is therefore sustained. DX26 is denied admission into evidence as a prior art reference.

That finding and that conclusion rest upon testimonial and documentary evidence which stands uncontradicted. Henry Orthman testified that he conceived the claimed inventive concept in the Spring or early Summer of 1970, and that he then drew his conceptual embodiment of the patent drawings on posterboard. That original drawing was not produced. Mr. Orthman testified that that original drawing could not be found by a search at plaintiff's premises. He fixed the time of his making the drawing with reference to three events, two of which had a direct, if not traumatic, bearing upon him personally. The first, and traumatic, event was the death of a daughter on August 29, 1970. The second event was the assumption of full-time employment at plaintiff's plant by his son, Bill Orthman, subsequent to the daughter's death. The third event devolves around plaintiff's witness Kenny Johnson, who was, at the time of the trial, an employee of Boeing Company at Wichita, Kansas. Mr. Henry Orthman testified that he had contracted with Mr. Johnson in the summer of 1970 to render a professional drawing from his posterboard drawing for submission to plaintiff's patent counsel, that a drawing had been made by Johnson, and that the latter drawing had been submitted to plaintiff's patent counsel for evaluation in about September 1970.

Mr. Johnson testified as follows: In the spring and summer of 1970, he was unemployed in his profession as a draftsman; he was then temporarily resident at Lexington, Nebraska, in the vicinity of plaintiff's plant; he had contacted Henry Orthman at that time to inquire whether any contract-drawing assignments might be available to him through plaintiff; he was assigned contract work by Henry Orthman at a time about June to August 1970, to make a drawing for submission to plaintiff's patent counsel; and he then prepared a drawing, which is in evidence as PX49, from a similar drawing made on a kind of posterboard. He could not recall precisely when he had made PX49. He testified that it was in the summer of 1970, and definitely done prior to November 4, 1970. The last mentioned date becomes a meaningful reference point by reason of a change in Mr. Johnson's standard procedures. Prior to November 4, 1970, he maintained no itemized record of contract work done for plaintiff and others.

On November 4, 1970, he began using a billing pad which itemized the work done by him. He fixed the drawing, PX49, as having been done before that time, by the fact that it did not appear upon itemized billings after November 4.

Other witnesses, including Bill Orthman, testified that they had seen Henry Orthman's original posterboard drawing in the summer of 1970. Plaintiff's patent counsel submitted to plaintiff an evaluation of patent-worthiness on November 8, 1970.

Thus, the totality of evidence adduced at the trial must lead to the finding and conclusion that the German application was not prior art to the patents in suit. Plaintiff cannot be faulted for its failure to disclose that reference to the Patent Office. That reference is equally unavailing in this litigation as a prior art reference.

1. The claims in issue are:
   a. The 693 patent:
   "9. An agricultural implement comprising, a frame having a tool bar carrying ground working tools thereon along its substantial length; said tool bar including a main frame and at least one wing section pivotally movable between raised and lowered positions, a hinge pivotally interconnecting said wing section and main frame, said main frame having an elongated opening in its end adjacent said wing section, a hydraulic cylinder being secured to said main frame and positioned in said opening and pivotally connected to said wing section at a point remote from the pivotal axis of said hinge, said wing section includes an ear connected to said cylinder and said ear extends into said opening in said main frame when said wing section is in said lowered position.
   "10. The structure of claim 9 wherein said hydraulic cylinder is detachably secured in said opening of said main frame by detachable fastening means operatively connecting said cylinder to said main frame and said fastening means is operatively exposed.
   b. The 194 patent:
   "11. An agricultural implement comprising, a tool bar including a main frame and at least one wing section, said wing section being pivotally movable between raised and lowered positions, a hinge pivotally interconnecting said wing section and said main frame, said main frame having an elongated passageway in its end adjacent said wing section, a hydraulic cylinder connected at one end to said main frame and positioned in said passageway and pivotally connected at its opposite end to said wing section at a point remote from the pivotal

## FINDINGS OF FACT

1. The 693 patent relates to an agricultural implement known as a folding tool bar. The 194 patent, which issued as a continuation in part of the 693, relates to the same tool bar combination. The claims in issue, in essence, describe a combination of a hollow main frame and oppositely extending wing sections which are hinged to the main frame and pivotal between horizontal and vertical positions, the main frame having hydraulic cylinders enclosed inside the opposed ends of the main frame member and each wing section having an ear affixed at the hinged end thereof which is connected to one of the hydraulic cylinders within the main frame member. The ear on each wing section is so disposed that the ear extends into the opening in the end of the main frame member when the wing is in its lowered position.[1]

axis of said hinge, and said wing section including an ear connected to said cylinder and said ear extends into said passageway in said main frame when said wing section is in said lowered position.

"12. An agricultural implement comprising, a tool bar carrying ground working tools thereon along its substantial length; said tool bar including a main frame and at least one wing section, said wing section being pivotally movable between extended and angular positions, a hinge interconnecting said wing section and said main frame, said main frame having an elongated passageway in its end adjacent said wing section, a hydraulic cylinder connected at one end to said main frame and positioned in said passageway and pivotally connected at its opposite end to said wing section at a point remote from the pivotal axis of said hinge, and said wing section including an ear connected to said cylinder and said ear extends into said passageway in said main frame when said wing section is in said extended position.

"13. An agricultural implement comprising, a tool bar carrying ground working tools thereon; said tool bar including a main frame and at least one wing section, said wing section being pivotally movable between raised and lowered positions, a hinge pivotally interconnecting said wing section and said main frame, said main frame having an elongated passageway in its end adjacent said wing section, a hydraulic cylinder connected at one end to said main frame and positioned in said passageway and pivotally connected at its opposite end to said wing section at a point remote from the pivotal axis of said hinge, and said wing section includ-

2. Plaintiff filed a terminal disclaimer as to the 194 patent. Both patents expire at the same time.

3. A tool bar is a frame structure designed to be pulled behind a tractor, upon which earthworking tools are mounted and carried along the length of the bar. The tool bar itself, as well as the folding tool bar, is old in the art. Prior to 1970, increases in the size and motive power of tractors designed for agricultural use fostered the need and demand for larger agricultural implements commensurate with the power capabilities of available tractors. As that development relates to the tool bar art, it required that tool bars be foldable to facilitate transportation of the equipment when installed upon the tractor. Foldability was accomplished by adding hinge-connected wing sections extending outward from the extremities of the central frame of the bar. Hydraulics had previously been employed for that purpose. The folding of each wing was accomplished by mounting a hydraulic cylinder exteriorly upon the bar together with exteriorly mounted connective superstructure to achieve vertical folding of the wings. Undesirable consequences of that structural means were the destruction of a clean-line of the implement, dead space upon the bar at points at which the folding mechanisms precluded the mounting of groundworking tools and the exposure of the cylinder and hydraulic lines to potential damage from dust or casualty. Such was the state of the tool bar art in the spring and summer of 1970.

4. To the extent that it is pertinent at this point, the narrative statements above related to the admissibility of DX26 are here incorporated as findings of fact.

5. In the spring of 1970, Mr. Henry Orthman conceived the idea of a folding tool bar in which the actuating hydraulic cylinder would be enclosed within the beam of the bar itself. That concept ultimately ripened into the 693 patent and the 194 patent, as a continuation, in part, of the 693

application. The combination embodied in the concept described in those patents did have the effect of substantially freeing the tool bar, together with its extended wings, for the mounting of tools along its total length, and, to an extent, of insulating the cylinder against damage.

6. When plaintiff constructed its first prototype tool bar based upon the patented concept, there was not available through normal supply channels a tool bar member of a size, namely, 7 inches by 7 inches, necessary to receive the cylinder for interior mounting. Plaintiff obtained and used as a bar member materials fabricated for the construction industry.

7. At the time of trial there were six manufacturers of enclosed-cylinder tool bars. Those were the plaintiff, the defendant, International Harvester Company, Deere and Company, Lilliston Corporation, and Alloway Corporation.

8. Plaintiff placed its enclosed cylinder tool bar on the market in 1972. At that time plaintiff had 14 employees and gross sales of less than $500,000 annually. At the time of trial, it employed about 100 persons and enjoyed an annual sales volume of about $6½ million.

9. In 1973, International Harvester engineers developed a design for a folding tool bar which employed an enclosed cylinder. A search by that corporation disclosed plaintiff's patent claims. Harvester then contacted plaintiff and, on December 5, 1973, accepted a non-exclusive license agreement for its use of the patents. Per that agreement, Harvester paid plaintiff $10,000 front money and agreed to a royalty of $10 per hinge, or $20 for each tool bar produced. Harvester has since paid to plaintiff approximately $110,000 pursuant to that agreement.

10. Plaintiff filed a patent infringement suit against Deere and Company. That suit was settled and resolved by Deere's acceptance of a non-exclusive license under the

ing an ear connected to said cylinder and said ear extends into said passageway in said main frame when said wing section is in said lowered position."

subject patents. That agreement provided for a royalty of $7.50 per hinge, or $15 per tool bar, with a minimum of $5,000 annual payment. Deere was given credit for a recited $10,000 front money as a part of the settlement. To the time of trial, Deere had paid approximately $90,000 to plaintiff under the licensing agreement. Following the Deere settlement, the Harvester royalty was reduced to $7.50 per hinge.

11. A non-exclusive license was granted by plaintiff to Lilliston Corporation on March 1, 1976, which exacted $10,000 front money, $7.50 per hinge, and an annual minimum royalty to plaintiff of $5,000. To the date of trial, Lilliston had paid royalties in the approximate amount of $30,000. Lilliston initiated the negotiations which led to that license.

12. Prior to September 19, 1980, Alloway Corporation requested a license under the patents. On that date Alloway was granted a non-exclusive license which provided for $3,500 front money, a royalty of $25 per bar, and a guaranteed annual royalty of $3,750.

13. Defendant began commercial production of its accused devices in September 1975, beginning with the Kewanee rotary hoe. When faced with plaintiff's patents, the Kewanee Division consulted its then patent counsel, who advised that Kewanee change the design as soon as possible to avoid infringement of the patents in suit. Terry Johnson, a former Kewanee engineer, was assigned to the task of creating a design which would obviate any claim of infringement, yet keep the hydraulic cylinder inside the tool bar frame member. Johnson did submit a design which Kewanee never accepted. Kewanee's vice president in charge of research and development refused to accept the opinion of Kewanee's then patent counsel. Counsel was terminated and new patent counsel was employed. The former president of Kewanee requested emergency capital funds for retooling, to avoid the Orthman patents. That request for funds was never approved. Defendant, to the time of trial, continued its production of the accused implements.

14. Defendant's prior art notice, under 35 U.S.C. § 282, cited twenty U.S. patents, the German patent application, certain publications relating to the MoTrim unit, which is a commercial device under the Barber patent, and publications related to the Rome Company's "Hydra Mower," which is a commercial device based upon the Coughran patent.

15. Of the U.S. patents thus cited, twelve were considered by the Patent Office during the prosecution of the Orthman applications.[2] At the trial of the case, defendant limited its evidence to the MoTrim and Hydra Mower, publications, Barber 3,308,611, Coughran 3,653,193, Hook 3,568,777, Aldred 3,015,497, Atwood 2,166,564, Swanson 2,289,224, Bill 3,087,627, and the German application only. With the German application excluded, Hook is the only reference which relates to tool bars.

16. Of those remaining references, Barber and the MoTrim publications relate to a boom mounted mowing attachment designed for non-farm use. Coughran and the Hydra Mower relates to a boom-mounted rotary mower designed for attachment to a motor grater for mowing roadsides. Aldred relates to a stabilizer unit—legs as it were—to stabilize back hoes and like equipment when operating. Both Atwood and Swanson are World War II vintage patents related to wing construction for folding wing aircraft. Bill relates to stabilizing legs for bracing vehicles. Thus, with the exception of Hook, all prior art upon which reliance is placed has a commercial, construction, or military emphasis.

17. With the exception of the Bill and Swanson patents, it appears that all prior art references cited by defendant were con-

---

2. References cited in the 693 application are: Lohrman 3,376,050; Handel 2,719,682; Graham 2,641,886; Anderson 3,298,446; Kopaska 3,314,386; Hornung 3,505,704; and Smith 3,529,672. References cited in the 194 continuation in part application are: McQueen 1,211,733; Ring 1,708,328; Heinje 2,767,866; Steinmitz 3,520,373; Smith, supra; and Kopaska 3,554,295.

sidered by the Patent Office, or by Deere, or by Lilliston, before those companies obtained a license under the patents in suit.

18. The relevant art is the agricultural implement art and, specifically, the art related to tool bars. That art encompasses the range of implements designed to perform agricultural operations.

19. The level of skill in the art at the time when the claimed invention was made was the technical skill of persons having an educational background in mechanical or agricultural engineering or experience in the design of agricultural equipment.

20. No single reference cited by the defendant discloses each and every element of any of the claims in litigation.

21. Summarized, the claims describe a combination of a tool bar, with at least one wing pivotally connected by a hinge to the main frame, a hydraulic cylinder secured to the main frame and affixed within an opening therein, the wing having an ear which is pivotally connected to the cylinder at a point remote from the pivotal axis of the hinges, which said ear extends into the opening in the main frame of the bar when the wing is in its lowered position.

22. Of the principal references upon which defendant relies, Hook is accurately described as disclosing the state of the tool bar art precedent to the inventive concept here claimed. It is the only reference which relates directly to agricultural implements or to an agricultural operation, i. e., the tilling of soil, crop planting, and crop cultivation. All other references are to non-analogous art. The plane wing patents, Atwood and Swanson, do disclose hydraulic cylinders within the wings, together with connective means and hinge means so applied as to accomplish folding of the wing.

23. The Bill, Coughran, Aldred, and Barber references describe devices having a commercial or construction application. Each does employ hydraulic means to achieve a particularly described purpose. Bill and Aldred describe leg mechanisms for bracing, leveling, or stabilizing construc-

tion-related vehicles. Barber and Coughran employ hydraulic means within a boom which supports a mechanism for roadside mowing. Barber specifically relates to a breakaway feature which protects the unit from damage when the mower encounters an obstruction. Coughran uses hydraulics to extend and regulate a mowing device affixed to a boom, designed to reach and cut vegetation located remotely from the path of travel of the vehicle to which it is attached. The MoTrim documents and the Coughran documents relate directly to commercial embodiments of the Barber and Coughran devices respectively. To a large degree, those references are merely cumulative of other references which were considered by the Patent Office. Among those references, the Handel patent related to a hydraulic mechanism for foldable airplane wings. During the processing of the 693 application, the Examiner rejected the application upon Handel in combination with Lohrman, the latter related to a drawbar with foldable sections. That position was successfully traversed upon the basis that the aircraft art and the agricultural implement art are entirely separate and distinct.

24. The skilled practitioner of the agricultural implement art would not have been expected to look to the non-analogous teachings of the aircraft art of industrial equipment art for his purpose of designing an agricultural implement.

25. Such art was deemed non-analogous by the attorneys and engineers for Lilliston, who concluded that the aircraft wing patents were the closest to the Orthman design, but that that art "did not lend itself to folding tool bar adaptation." Only Mr. Coughran, who testified as an expert witness for defendant, even suggested that a practitioner in the implement art would logically look to the aircraft art. In response to a question on cross-examination, he stated, in effect, that such a practitioner would not be expected to look initially to the aircraft art, but that the latter art should be searched for "litigation." He later modified the quoted word by saying, in effect, that such search should be made for patenting purposes.

26. Although Mr. Coughran did testify that he found the enclosed cylinder, connecting means, an ear, etc., in one or another of the references to which he testified, his testimony did not contain any explanation by him as to how the grouping of those divers elements into Orthman's combination would, in 1970, have been obvious to a person having ordinary skill in the art.

27. Each of the accused devices, i. e., the K470, the B608, and the K3000, has a cylinder enclosed within the main frame of the bar and employs two intermediate links to connect the hydraulic cylinder to an ear on the wing section, which perform the function of transferring the motion of the piston rod to the ear and thus rotate the wing section. The ear of the K470 extends into the opening in the main frame section when the wing is in its lowered position. The ear of the B608 and the K3000 extends into an opening between parallel hinge plates which are an extension of the main frame.

28. Each of the accused devices has a 180° fold capability in each wing, as contrasted with plaintiff's commercial bar which is limited to a 90° capability.

29. In the context of these findings, the words "ear" and "connect," as those terms are employed in the asserted claims, are given their generally accepted meanings. "Ear," in the context of machinery, means a projection attached to another machine component. The word "connect" is defined as "to join or fasten together by something intervening." When measured by those definitions, the cylinder rod is connected to an ear upon the wing section in each accused structure within the meaning of those words as employed in claim 9 of the 693 patent and in claims 11, 12, and 13 of the 194 patent.

30. The K470 has correspondence of structure with every structural element defined by claims 9 and 10 of the 693 patent, and by claims 11, 12, and 13 of the 194 patent.

31. The B608 and the K3000 each has correspondence of structure with every element defined in each of the said claims.

32. The fact of 180° fold capability of the accused structures has no significance. Each claim in suit describes a wing section "being pivotally movable between raised and lowered positions." That language does not limit the claims with reference to any degree of fold capability.

33. The use by defendant of intermediate links in its commercial embodiments cannot avoid the claims of the patent. If evidence other than the observable equivalency of means is necessary, the transcript provides evidence that two of the licensees so construe the claims. Harvester manufactures two structures, both of which employ intermediate linkage to achieve a greater than 90° fold capability. Its in-house engineers and counsel determined that its design fell within the scope of these patent claims. Alloway also employs intermediate links upon its commercial product to achieve a 180° fold capability. It, too, construed the claims as covering its design.

34. The K470, the B608, and the K3000 infringe claims 9 and 10 of the 693 patent and claims 11, 12, and 13 of the 194 patent.

35. The infringement by defendant of plaintiff's patent rights was, is, and remains deliberate and wilful. Allusion has previously been made to evidence of defendant's actions and conduct in the face of the patents in suit. The termination of its patent counsel because defendant would not accept counsel's opinion that its devices did infringe, and the positive effort, though unavailing, to design a structure which at once retained the enclosed cylinder and would avoid the claims, are consistent only with a finding that defendant knew that it was infringing the patents if the same were valid.

36. The only sources of concealed cylinder tool bars are the plaintiff, plaintiff's licensees, and the defendant.

37. Between September 1975, when it first began commercial production of its K470 rotary hoe, and October 14, 1980, defendant had produced 2,004 enclosed cylinder tool bars in conjunction with its manufacture of the accused structures.

38. As of the time of trial, plaintiff and its licensees had manufactured 14,800 tool bars, as reflected by plaintiff's records. Plaintiff has had a 19 percent share of that market. From 1972 through the fiscal year 1980, plaintiff's average pre-tax profit on sales of tool bars manufactured by it was $104 per bar.

39. Had defendant not followed its pattern of infringement, it may reasonably be inferred that plaintiff would have enjoyed a 19 percent share of the market generated by that infringement. It was, up to October 14, 1980, deprived of profits which it could reasonably have anticipated on sales of 381 additional units at its average profit, for a total sum of $39,624.

40. Harvester, willingly and prior to any litigation, negotiated a license agreement under the patents on December 5, 1973. It agreed to pay for that license $10,000 front money, plus a royalty of $20 per tool bar.

41. For all infringing units over and above those for which plaintiff may claim its average profits based upon anticipated sales, plaintiff is entitled to damages, based upon the conversion of the willing-licensee figures to 1980 dollars. The $10,000 front money paid by Harvester in 1973 is equivalent to the sum of $20,100 as of August 1980. The $20 per tool bar royalty is the equivalent of $40.20.

42. Because of the positive evidence of defendant's wilful infringement, making it an exceptional case, this is an appropriate case for the awarding of treble damages and plaintiff's attorneys' fees.

### CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and the subject matter in litigation.

2. The patent claims in suit inherently possess utility within the meaning of 35 U.S.C. § 101, and the same are novel within the intendment of 35 U.S.C. § 102. A claimed invention is anticipated within the meaning of Section 102 only if the same elements, except for insubstantial modifications which operate in the same way to perform an identical function, are described in a single previous patent or other prior art reference. *Popeil Brothers, Inc. v. Schick Electric, Inc.*, 494 F.2d 162, 164 (7th Cir. 1974).

3. Section 102 defines what is and what is not prior art, for the purpose of applying the obviousness test of 35 U.S.C. § 103. *Graham v. John Deere Co.*, 383 U.S. 1, 14–15, 86 S.Ct. 684, 692, 15 L.Ed.2d 545 (1966). Section 103 measures the critical date for that determination with relation to art existing at the time when the claimed invention was made.

4. A foreign patent application is not prior art within the intendment of Section 103 until the same is published, irrespective the fact that it may have had a filing date prior to the date of publication. *E. g., Application of Ekenstam*, 256 F.2d 321, 45 C.C.Pa. 1022 (1958); *Joseph Bancroft & Sons v. Brewster Finishing Co.*, 113 F.Supp. 714, 718 (D.N.J.1953), *aff'd* 210 F.2d 677 (3d Cir. 1954).

5. The evidence related to Mr. Orthman's having made and described his claimed invention sufficient to apprise persons skilled in the art of the elements and content of the invention claimed, *e. g., Moline Plow Company v. Rock Island Plow Company*, 212 F. 727, 732 (7th Cir. 1914), is clear and unequivocal. It is sufficient to prove an invention date which antedates the date of filing of the 693 application. *McIlvaine Patent Corporation v. Walgreen Co.*, 138 F.2d 177, 179 (7th Cir. 1943).

6. When a patent application is filed which discloses the same invention as that described in a previous application, its effective filing date is that of the previous application, if it is filed in the name of the same inventor while the original application remains pending before the Patent Office and it contains a specific reference to that prior, co-pending application. *E. g., Technicon Instruments Corporation v. Coleman Instruments*, 385 F.2d 391, 393 (7th Cir. 1967).

7. As a matter of law, plaintiff is entitled to the benefit of its proved date of invention as to the claims of both patents, for determination of the obviousness issue.

As a matter of law, the German application, which was first published on November 26, 1970, is not a prior art reference within the intendment of Section 103.

■■■ 8. An issued patent is presumed to be valid. 35 U.S.C. § 282. When validity is questioned, the burden is on the defendant to prove invalidity by clear and cogent proof. *E. g., Reese v. Elkhart Welding and Boiler Works, Inc.*, 447 F.2d 517, 526 (7th Cir. 1971); *Illinois Tool Works, Inc. v. Continental Can Company, Inc.*, 397 F.2d 517, 519 (7th Cir. 1968). That presumption may be overcome by proof that the patent claimant failed to disclose pertinent prior art references to the Patent Office. To overcome the presumption, a defendant must prove by clear and convincing evidence that there was a failure to disclose a prior art reference, that that reference describes the claimed invention, or that it is more relevant to the inventive claims than was the art considered by the Patent Office, and that the failure of disclosure was deliberate and intentional. *E. g., Feed Service Corporation v. Kent Feeds, Inc.*, 528 F.2d 756, 762–763 (7th Cir. 1976). The presumption of validity is strengthened when the prior art adduced by the defendant is cumulative and the equivalent of the art which was considered and rejected by the Patent Office. *E. g., Illinois Tool Works, Inc. v. Continental Can Company, Inc., supra.* The presumption is further strengthened when the evidence reveals that, in the course of prior adversary litigation based upon the patents in suit, the principal prior art references relied upon to defeat the presumption were considered by the adversary in such prior litigation in the course of a settlement of the litigation prior to trial. *E. g., Research Corporation v. NASCO Industries*, 501 F.2d 358 (7th Cir. 1974); *Laser Alignment, Inc. v. Woodruff & Sons, Inc.*, 491 F.2d 866 (7th Cir. 1974).

9. Secondary considerations such as commercial success of a claimed invention may have relevance to the obviousness question by shedding light upon the circumstances surrounding the origin of the patented subject matter. *E. g., Graham v. Deere, supra*, 383 U.S. at 17–19, 86 S.Ct. at 693–694; *LaSalle Street Press v. McCormick and Henderson*, 445 F.2d 84, 93 (7th Cir. 1971). That principle must be approached with recognition that such secondary considerations, alone, will not demonstrate non-obviousness when it appears from the prior art that the claimed subject matter would have been obvious to persons skilled in the art.

10. The industry recognition of the claims in suit, as measured against the principal prior art references now put forth, greatly strengthens a conclusion that those claims were not obvious at the time when the claimed invention was made. All of plaintiff's competitors, *with the exception of defendant*, have recognized the validity of the claims. With the single exception of Deere, among that group, all requested and obtained a license without litigation or the threat of litigation. That evidence greatly fortifies a necessary conclusion that the claims are valid within the meaning of Section 103.

■■ 11. The relevant art may extend to analogous arts. To be analogous to the art practiced, the elements and purposes of the related art must be so related and similar to those in the art directly practiced that they would readily appeal to the mind of a person having ordinary skill in the latter art. If an art is so far removed from the subject art that it would not have that appeal, then such art is non-analogous. *E. g., Copeman Laboratories Co. v. General Plastics Corporation*, 149 F.2d 962 (7th Cir. 1945).

12. This claimed invention must be measured by the agricultural implement art. Such diverse art as that related to aviation and to boom or support structures for commercial or construction equipment would not be anticipated to be a part of the logical thought processes of a person of ordinary skill in the art of designing agricultural tool bars or related agricultural equipment.

■■ 13. Claims 11, 12 and 13 of the 194 patent are not invalid as double patenting. A terminal disclaimer was filed in the 194

application. The Examiner resolved any question of double patenting by his allowance of the divisional application over the 693 application and patent as a reference before him. *E. g., St. Regis Paper Company v. Bemis Company, Inc.*, 403 F.Supp. 776 (S.D.Ill.1975), *rev'd on other grounds*, 549 F.2d 833 (7th Cir. 1977). In view of testimony that those claims are capable of being infringed without necessarily infringing claim 9 of the 693 patent, the terminal disclaimer is effective. *E. g., Application of Vogel*, 422 F.2d 438, 57 C.C.Pa. 920 (1970).

14. Defendant failed to prove invalidity in the areas above discussed, and also with respect to its contention that fraud upon the Patent Office affected either application.

15. Infringement of a patent is the unauthorized making, using, or selling of an invention claimed during the life of a valid patent. 35 U.S.C. § 271.

16. An accused structure infringes a patent if the structure falls clearly within the subject matter of a valid claim of the patent, *e. g., Graver Tank and Manufacturing Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950); *CTS Corporation v. Piher International Corporation*, 527 F.2d 95, 100 (7th Cir. 1975), or if the accused product is the equivalent of the patented subject matter. *E. g., Graver Tank and Manufacturing Co. v. Linde Air Products Co., supra; Reese v. Elkhart Welding and Boiler Works, Inc.*, 447 F.2d 517, 527–528 (7th Cir. 1971).

17. Defendant's K47, B608, and K3000 devices fall within the language of claims 9 and 10 of the 693 patent and claims 11, 12, and 13 of the 194 patent. Its manufacture of those devices is done without plaintiff's authorization, and the cited claims are therefore infringed.

18. Damages are to be assessed upon a finding of infringement in an amount not less than a reasonable royalty for the infringing use of the invention. A court may increase such damages up to three times the damages assessed, and in exceptional cases may award reasonable attorney fees to the prevailing party. 35 U.S.C. §§ 284 and 285.

19. One proper measure of damages is the amount which a willing licensee would agree to pay for use of the patent without the threat of litigation or other compulsion that he seek a license. *E. g., Union Carbide Corporation v. Graver Tank & Mfg. Co.*, 282 F.2d 653, 669 (7th Cir. 1960). The actual royalty rate charged of its licensees by the offended patentee is not necessarily determinative as to a reasonable royalty, when it appears that the rate actually charged has previously been lowered as the result of prior litigation. *Trio Process Corporation v. L. Goldstein's Sons, Inc.*, 612 F.2d 1353 (3d Cir. 1980).

20. A patentee may also recover his profits based upon sales which he can show, with a reasonable degree of certainty, he could be expected to have enjoyed had the infringer not entered into the market. *Hughes Tool Company v. G. W. Murphy Industries, Inc.*, 491 F.2d 923, 929 (5th Cir. 1973).

21. The measure of damages which is appropriate in a particular case should be determined with reference to all relevant circumstances shown to affect the litigation. Such circumstances include the probability of success in proving invalidity, as reflected by the factors which were known to the defendant when he began his infringing ways, and the evidence on the part of the defendant. As one court observed, an infringer, at the close of extensive litigation, should not be entitled to the benefit of the royalty which others were willing to pay without compulsion. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158–1159 (6th Cir. 1978). That observation would seem to be doubly cogent in the light of the trial record here.

### Computation of Damages

Upon the total record in this litigation, damages will be assessed by the following criteria. Plaintiff shall be compensated for the profits which it reasonably would have enjoyed, absent this infringement, at the rate of $104 per unit upon 19 percent of all infringing units manufac-

tured by defendant. Damages upon additional infringing units will be measured by the payments initially exacted in the Harvester license ($10,000 and $20 per unit), raised to the 1980 equivalent value of all such payments as hereinabove found ($20,-100 and $40.20 per unit). Because of the compelling evidence of defendant's wilful infringement, such damages will be trebled. For the reasons discussed above, this suit is determined to be exceptional, and plaintiff is entitled to recover its reasonable attorneys' fees. Judgment will be ordered for the plaintiff applying these criteria.

### ORDER FOR JUDGMENT

IT IS ORDERED, therefore, that:

a. An injunction shall issue which will permanently enjoin defendant from further infringement of the claims in issue.

b. Plaintiff is entitled to damages for past infringement, computed with reference to the above findings and conclusions, in an amount not less than $124,968.60, which amount shall be trebled.

c. The defendant shall fully account to the plaintiff for all infringing units manufactured after October 14, 1980, for further damages which shall be computed in the same manner.

d. Plaintiff shall recover its reasonable attorneys' fees.

e. Jurisdiction is reserved to consider any issues which may arise related to the above accounting or to attorneys' fees.

Plaintiff shall prepare and submit to the court, together with proof of service thereof on counsel for defendant, a proposed injunction order and judgment order consistent with this opinion.