**ENDRESS + HAUSER, INC. and ENDRESS + HAUSER GmbH & Co., Plaintiffs,**

v.

**HAWK MEASUREMENT SYSTEMS PTY. LIMITED and Hawk America, Inc., Defendants.**

No. IP 92–440–C.

United States District Court, S.D. Indiana, Indianapolis Division.

June 27, 1995.

As Amended Aug. 4, 1995.

Donald E. Knebel, James A. Coles, Mark Janis, Dwight D. Lueck, Barnes & Thornburg, Indianapolis, IN, for plaintiffs.

Thomas G. Watkins III, Cahill, Sutton & Thomas, Phoenix, AZ, for defendants.

## ENTRY REGARDING PATENT DAMAGES ISSUES

BARKER, Chief Judge.

This entry addresses the remaining damages issues tried on April 6, 1995, as the second part of the bifurcated trial. In the first part of the bifurcated trial, this Court found that Defendants Hawk Measurement Systems Pty. Limited, Inc., and Hawk America, Inc. ("Defendants" or "Hawk") literally infringed Plaintiffs Endress + Hauser, Inc.'s and Endress + Hauser GmbH's (collectively "E + H" or "Plaintiffs") patent. *See Endress + Hauser, Inc. v. Hawk Measurement Systems Pty.*, No. IP 92–440–C, 1994 WL 736442, 32 U.S.P.Q.2d 1768 (S.D.Ind. Aug. 29, 1994). In its entry dated June 27, 1995, the Court found that the claims of the patent at issue were not invalid. Having heard and considered the evidence on damages, the Court finds that Defendants did not willfully infringe Plaintiffs' patent and that Plaintiffs are entitled to a reasonable royalty in the amount of $233,998. The Court, accordingly, enters the following findings of fact and conclusions of law.

## I. *FINDINGS OF FACT ON DAMAGES*

1. The Court has previously found that the defendants infringed claims 43, 44 and 46 of U.S. Patent No. 4,000,650 ("the '650 Patent"). (Entry of August 31, 1994). The Court must now determine the damages which the plaintiffs suffered as a result of the defendants' infringement.

2. In this case, the Court will award the plaintiffs a reasonable royalty. The calculation of a reasonable royalty will take into account a wide variety of considerations, including: (1) the effect of selling patented items in promoting sales of non-patented items; (2) the consideration paid by E + H Germany to obtain the '650 Patent; (3) the royalty paid by another competitor, Milltronics, Inc., under the '650 Patent; (4) the plaintiffs' licensing policies; (5) the commercial relationship between the plaintiffs and defendants; and (6) the profitability of the products made under the '650 Patent.

I. *Compensatory Damages.*

  A. *Reasonable Royalty.*

    1. *Facts Relevant to Reasonable Royalty Determination and Amount of Lump Sum.*

    a. *Effect of selling patented items in promoting sales of non-patented items.*

3. E + H Greenwood has been in the business of selling ultrasonic material level measurement systems since 1988. (Schaffer testimony).

4. E + H expected that ultrasonic material level measurement systems would be popular when it began selling those systems in 1988. (Schaffer testimony).

5. E + H's expectations proved to be true. Between 1988 and 1992, E + H sold more ultrasonic material level measurement systems each year, increasing from sales of 19 systems in 1988 to 886 systems in 1992. (Plaintiff's Ex. AX).

6. In 1991, 1992 and 1993, about 10% of E + H Greenwood's total sales were sales of ultrasonic material level measurement systems. (Schaffer testimony).

7. Sales of these systems helped to promote sales of E + H Greenwood's other products. Often a customer who bought ultrasonic level measurement systems also bought other measurement-related products from the same vendor. (Schaffer testimony).

b. *Consideration paid by E + H to obtain the '650 Patent.*

8. E + H first became aware of the '650 Patent in late 1987 or early 1988. (Schaffer testimony).

9. E + H considered the '650 Patent significant because it was the first patent to claim the use of digital technology for ultrasonic measurements in a closed environment. (Schaffer testimony).

10. E + H was concerned that it would infringe the '650 Patent if it sold its ultrasonic level measurement systems in the United States. Consequently, it sought to purchase the '650 Patent or to obtain a license under the '650 Patent. (Schaffer testimony).

11. On May 3, 1988, E + H Germany entered into a transaction with Berwind Corporation, then the owner of the '650 Patent, to purchase that patent, its British and Canadian counterpart patents, and a second U.S. patent. As part of that transaction, the parties executed a patent assignment agreement by which E + H Germany paid Berwind $155,000.00. (Defendant's Ex. 117).

12. Licensing the Vibratrol to Berwind in exchange for purchase of the '650 Patent was a significant element of the consideration paid to obtain the '650 Patent. The Vibratrol was tremendously profitable at the time Berwind obtained its know-how license from E + H. At the time, E + H Greenwood was obtaining gross profits on the Vibratrol of approximately 60%. (Schaffer testimony).

13. At the time that Berwind obtained its know-how license, E + H Greenwood was the only supplier of Vibratrols in the United States. When Berwind began competing with E + H Greenwood for those sales, it drove down the price at which E + H Greenwood was able to sell E + H's own Vibratrols. This downward pressure on the Vibratrol selling price was an additional cost to E + H of obtaining the '650 Patent. (Schaffer testimony).

c. *Consideration paid by Milltronics to obtain a license under the '650 Patent.*

14. In 1990, E + H Germany sued Federated Industries Industrial Group, Inc. ("Federated") for infringing Canadian Patent No. 1,067,992, the Canadian counterpart of the '650 Patent.

15. In order to settle this lawsuit, on March 26, 1991, Federated took a license under the '650 Patent and its Canadian counterpart. (Defendants' Ex. 118).

16. Federated is the owner of Milltronics, Inc. ("Milltronics"), which was the major seller of ultrasonic material level measurement systems in the United States in 1991. Milltronics is approximately five to six times the size of E + H Greenwood. (Schaffer testimony).

17. In return for licensing the '650 Patent, the Canadian and British counterparts of that patent, and a second United States patent to Federated, Federated paid E + H $12,500 Canadian, $12,500 U.S., and E + H paid Federated $25,000 Canadian, $25,000 U.S. and received a cross-license under U.S. Patent No. 4,596,144 (the " '144 Patent") and its Canadian counterpart. (Defendants' Ex. 118).

18. The '144 Patent, which was cross-licensed to E + H as part of the license to Federated of the '650 Patent, is an extremely valuable patent. The '144 Patent allows E + H to incorporate "bin mapping" into E + H's ultrasonic material level measurement sys-

tems. "Bin mapping" allows ultrasonic material level measurement systems to block out obstacles in the storage bin which could cause the measurement system to register false measurements. (Schaffer testimony).

19. The invention disclosed in the '144 Patent was worth hundreds of thousands of dollars to E + H and allowed E + H to incorporate a major technological innovation into its ultrasonic material level measurement systems. (Schaffer testimony).

20. Obtaining a cross-license under the '144 Patent was a key element of consideration for licensing the '650 Patent to Federated. (Schaffer testimony).

d. *E + H's licensing policies.*

21. E + H does not routinely license its know-how or patents to its competitors. It would rather make the sales of devices incorporating that know-how or patented technology itself. (Schaffer testimony).

22. When E + H does license its know-how or patented technology, it seeks to do so in return for a cross-license on other technology, such as the technology it obtained from Federated by licensing the '650 Patent to Federated. (Schaffer testimony).

23. If E + H did license the '650 Patent to a competitor without receiving a cross-license on additional technology in return, it would require an up-front payment in addition to a royalty based on actual sales of licensed products by that licensee. (Schaffer testimony).

24. E + H received a similar up-front payment when it cross-licensed the Vibratrol know-how to Berwind. (Plaintiff's Ex. RR).

e. *Competitive relationship between E + H and Hawk.*

25. Hawk America is a competitor of E + H Greenwood for sales of ultrasonic material level measurement systems in the United States. (Schaffer testimony).

26. Hawk America markets its ultrasonic material level measurement systems to the same customers as E + H Greenwood. The two competitors appear at many of the same trade shows. (Schaffer testimony).

27. When Hawk America began selling ultrasonic material level measurement sys-

tems in the United States in 1991, E + H would have anticipated that Hawk America would be a competitor of E + H Greenwood for sale of those systems. (Schaffer testimony).

28. Based on its experience in licensing the Vibratrol know-how to Bindicator, in 1991 E + H would have anticipated that competition by Hawk America for sales of ultrasonic material level measurement systems in the United States would exert downward pressure on the sales of ultrasonic material level measurement systems by E + H Greenwood, would result in lost sales of ultrasonic material level measurement systems by E + H Greenwood, and would result in lost sales of products by E + H other than ultrasonic material level measurement systems. (Schaffer testimony).

f. *Profitability of products made under the '650 Patent.*

1. *Profitability of products made by E + H.*

29. In 1990 and 1991, E + H Greenwood obtained gross profits of approximately 30% on sales of its ultrasonic material level measurement systems. This gross profit was obtained after paying the cost of the products, which were purchased from E + H Germany, domestication costs, and sales commissions. (Plaintiff's Ex. AP; Schaffer testimony).

30. In 1991, E + H anticipated that it would continue to obtain similar profits in the future. (Schaffer testimony).

31. In fact, E + H Greenwood obtained similar profit margins in 1992 and 1993. (Schaffer testimony).

32. E + H Germany obtained profits above the cost of production (labor and materials) for ultrasonic material level measurement systems of between 60% and 70% in 1989 and anticipated similar profits in the future. (Plaintiff's Ex. AZ; testimony of Schaffer).

33. Approximately one half of the cost of ultrasonic material level measurement systems to the American consumer is represented by the sale price of the systems from E +

H Germany to E + H Greenwood. (Schaffer testimony).

34. Thus, approximately 30% to 35% of the price to the American consumer is profit to E + H Germany. (Schaffer testimony).

35. This is in addition to the 30% profit obtained by E + H Greenwood on these measurement systems. (Schaffer testimony).

### 2. Profitability of products made by Hawk under the '650 Patent.

36. Hawk America anticipated that it would make profits on ultrasonic material level measurement systems when it began considering sales of those systems in the United States in 1991. (Richards testimony).

37. Hawk America's total sales were primarily sales of ultrasonic material level measurement systems. (Cf. Plaintiff's Ex. SS and Stipulation of the Parties, filed April 3, 1995).

38. At trial, Hawk America contended that it had not made any profits. (Richards testimony). However, Hawk America's stipulated financial records establish that Hawk America did make substantial profits. In 1991, Hawk America reported gross profits of 77.8% and net profits of 34.8%. (Plaintiff's Ex. SS, pages 2 and 3).

39. Hawk America reported gross profits of 50.5% in 1992 and gross profits of 27.6% in 1993 through November 30, 1993. (Plaintiff's Exs. TT and UU).

40. These profits do not reflect any profits obtained by co-defendant Hawk Australia. (See Plaintiff's Exs. SS, TT and UU).

### 3. Determination of a Reasonable Royalty Rate and Amount of Lump Sum.

41. In determining a reasonable royalty, the Court takes into account the facts set out above concerning: (1) the positive effect that selling patented ultrasonic products has in promoting sales of non-patented items; (2) the extensive consideration paid by E + H Germany to obtain the '650 Patent; (3) the significant royalty paid by Federated to obtain a license under the '650 Patent; (4) the plaintiffs' policies against licensing products without obtaining cross-licenses in return; (5) the adversarial commercial relationship between the plaintiffs and defendants; and

(6) the profitability of products made under the '650 Patent.

42. Taking all of these factors into consideration, if E + H and the defendants had conducted a hypothetical negotiation in June 1991 for the licensing of the '650 Patent, a reasonable royalty would have been a lump sum payment of $100,000.00 and 15% on all sales of licensed products. (Schaffer testimony).

43. The defendants offered no credible testimony which could serve as the basis for a royalty of less than the reasonable royalty set out above. For example, at trial, the only "reasonable royalty" which the defendants suggested was a royalty of $0.00, based on the false assertion that Hawk America had made no profits in the United States from 1991–1993. (See Richards testimony).

44. The defendants also appear to contend that a reasonable royalty would be de minimis because E + H Germany only paid $155,000 in cash to Berwind for the '650 Patent and other patents, and because Federated paid E + H Germany only $25,000 in cash to license the '650 Patent and other patents. (See Stipulated Testimony of Burton).

45. The Court finds that E + H Germany gave consideration in addition to the $155,000 in cash paid to Berwind to obtain the '650 Patent. (See Plaintiffs' Ex. RR, licensing Vibratrol know-how; testimony of Schaffer).

46. As to the cross-license with Federated, the plaintiffs received the extremely valuable consideration of a license under the '144 Patent in exchange for licensing the '650 Patent to Federated. (Defendants' Ex. 118). That additional consideration must be considered in evaluating the worth of the '650 Patent. (Schaffer testimony).

47. In short, the defendants introduced no credible evidence which would provide the basis for a reasonable royalty of less than the reasonable royalty established by E + H.

### 4. Calculation of the Reasonable Royalty.

48. Total sales of products sold by Hawk America in the United States and falling within the scope of Claims 43, 44 and 46 of the '650 Patent, as those claims have been

interpreted by this Court, is $1,072,412. Sales by year were:

| 1991 | $179,093 | (16.7% of total sales) |
|------|----------|------------------------|
| 1992 | $441,834 | (41.2% of total sales) |
| 1993 | $451,485 | (42.1% of total sales) |

(Stipulation of the Parties, filed April 3, 1995).

49. In early 1990, Mr. Gordon Beazley, one of the founders of Hawk Australia and currently a director and consultant of Hawk Australia, had actual knowledge that the plaintiffs had accused the Hawk system of infringing the '650 Patent. This knowledge came from a letter, dated March 14, 1990, from E + H Greenwood which directly accused the Hawk system of infringing the '650 Patent. (Beazley testimony; Plaintiffs' Ex. JJ).

50. In calculating a reasonable royalty, the Court will apply the reasonable royalty rate to Hawk's sales, as set forth above, starting from April 14, 1992, and extending through the expiration date of the patent (approximately the end of 1993).

51. Knowledge of the March 14, 1990, infringement letter to Hawk Australia cannot be imputed to Hawk America, because actual notice in the form of a letter or another form of communication must be given to *each* infringer. The evidence at trial shows that Plaintiffs only gave actual notice of infringement to Hawk Australia.

52. The Court finds that a reasonable royalty is $100,000. Although Plaintiffs proposed a lump-sum figure of $200,000 in their post-trial brief, the Court finds an evidentiary basis for awarding only a $100,000 lump-sum figure. Accordingly, the lump-sum figure to which Plaintiffs are entitled is $100,-000 plus 15% of all sales of products sold by Hawk America in the United States from April 14, 1992, to the end of 1993, which fall within the scope of Claims 43, 44 and 46 of the '650 Patent, as those claims have been interpreted by this Court.

53. The 15% royalty calculation based on sales of licensed products is as follows:

| 1992 | $ 46,922 |
|------|----------|
| 1993 | $ 67,723 |
|      | $114,645 |

54. This amount, plus the $100,000 lump sum payment, equals a total reasonable royalty of $214,645.

**B.** *Prejudgment Interest.*

55. E + H is also entitled to prejudgment interest of 7.5%, compounded annually. Interest on the $100,000 lump sum payment of the reasonable royalty will be calculated starting from April 14, 1992, to the date of this judgment. Interest on the 15% royalty based on the defendants' sales in the United States of products falling within the scope of Claims 43, 44 and 46 of the '650 Patent, as those claims have been interpreted by this Court, is due from December 31 of each of the years in which those products were sold.

56. The interest on the lump sum payment of $100,000 is $25,312. The interest on the other amounts is $8,516 on the royalties due on December 31, 1992, and $7,619 on the royalties due on December 31, 1993.

**II.** *Enhanced Damages.*

57. Considering the totality of the circumstances as presented by the parties, the Court is not persuaded that clear and convincing evidence establishes that Hawk deliberately copied the '650 patent or failed to form a good faith belief that the '650 patent was not infringed.

58. The record indicates that Beazley changed the Hawk device to incorporate the A/D converter because single threshold comparators were becoming obsolete and scarce. (Beazley testimony). When Hawk received notice of the infringement letter, Beazley consulted an Australian attorney—Alfred Tatlock—who rendered the opinion that Hawk did not infringe the '650 patent.[1] Beazley also independently read the Snyder patent and reached the same conclusion.

---

1. The Court has considered Plaintiffs' motion to strike any testimony regarding the advice of Tatlock because Hawk failed to disclose such testimony earlier based on attorney-client privilege. The Court denies Plaintiffs' motion as moot because our finding of non-willfulness does not ultimately depend on evidence of Hawk's reliance on Tatlock's opinion of non-infringement. Instead, we note only that Hawk did seek an opinion of counsel.

59. Although the Court has rejected Hawk's non-infringement arguments in the first phase of the bifurcated trial, it concludes that Beazley's conception of the differences between the Hawk device and the Snyder device cannot be characterized as willful; nor does the Court find that Hawk's use of an A/D converter was solely linked to its awareness of the '650 patent.

60. The Court has considered and rejects Plaintiffs' argument that Hawk's litigation conduct was unduly burdensome on E + H or this Court. The Court finds that Hawk did not engage in a shotgun defense or file meritless motions with this Court.

61. As to other factors, such as the size and financial conditions of the parties, the closeness of the case (on the issues of validity and willfulness), the duration of Hawk's infringement, Hawk's motivation for harm, and Hawk's attempts to conceal any misconduct, the Court finds that none of these factors favors a finding of willfulness.

62. Accordingly, the Court concludes that Hawk did not willfully infringe E + H's patent and declines to award enhanced damages under 35 U.S.C. § 284 or attorney fees under 35 U.S.C. § 285.

63. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the court. Any finding of fact stated above, to the extent that it constitutes a conclusion of law, is incorporated by reference below as an additional conclusion of law.

## II. PROPOSED CONCLUSIONS OF LAW ON DAMAGES

### A. Reasonable Royalty.

1. 35 U.S.C. § 284 provides in part: "Upon finding for the claimant [patent owner], the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." Section 284 sets a floor for compensatory damages. *Seattle Box Co. v. Industrial Crating &* *Packing Inc.,* 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed.Cir.1985).

2. "When an established royalty does not exist, a court may determine a reasonable royalty based on 'hypothetical negotiations between willing licensor and willing licensee'" during a hypothetical negotiation. *Wang Laboratories, Inc. v. Toshiba Corp.,* 993 F.2d 858, 870 (Fed.Cir.1993) (quoting *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1574, 7 USPQ2d 1606, 1612 (Fed.Cir.1988)); *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1561, 219 USPQ 377, 385 (Fed.Cir.1983). That negotiation is presumed to have taken place as of the date the patent infringement began. *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1079, 219 USPQ 679, 681–82 (Fed.Cir.1983); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158, 197 USPQ 726, 731 (6th Cir.1978).

3. Although courts employ the "willing licensor/willing licensee" model as the basis for determining a reasonable royalty, they do so with the understanding that a "reasonable" royalty after infringement is likely to be higher than that arrived at between truly willing patent owners and licensees. *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158–59, 197 USPQ 726, 731 (6th Cir.1978); *Medtronic, Inc. v. Catalyst Research Corp.,* 547 F.Supp. 401, 415, 216 USPQ 687, 699 (D.Minn.1982) ("[T]he reasonable royalty 'fiction' should not be applied in a vacuum so as to encourage infringement that requires the patent owner to undertake expensive litigation only to collect the normal royalty rate …").

4. *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120, 166 USPQ 235, 238 (S.D.N.Y.1970), *modified,* 446 F.2d 295, 170 USPQ 369 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971) sets forth the evidentiary factors potentially relevant to the determination of a reasonable royalty. The Court of Appeals for the Federal Circuit has accepted the "*Georgia Pacific* " factors as the benchmark for reasonable royalty determinations. *See, e.g., SmithKline Diagnostics, Inc. v. Helena*

*Labs. Corp.,* 926 F.2d 1161, 1168, 17 USPQ2d 1922, 1928 (Fed.Cir.1991).

5. The following *Georgia Pacific* factors are particularly relevant to the court's determination of a reasonable royalty in this case:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

.    .    .    .    .

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

.    .    .    .    .

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

.    .    .    .    .

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

*Georgia Pacific,* 318 F.Supp. at 1120, 166 USPQ at 238.

■ 6. While the infringer's profits may be considered as evidence of what the infringer would have agreed to in a hypothetical negotiation, the infringer is not entitled to use his alleged losses to place a ceiling on the damages award. *Stickle,* 716 F.2d at 1560, 219 USPQ at 384 ("[D]amages are 'compensation for the pecuniary loss he [the patent holder] suffered from the infringement, without regard to the question whether the defendant gained or lost by his unlawful acts.'") (*quoting Coupe v. Royer,* 155 U.S. 565, 582, 15 S.Ct. 199, 206, 39 L.Ed. 263 (1895)).

■ 7. In calculating a reasonable royalty rate, the court "must design a methodology for the hypothetical negotiation that comports with industry practice." *Johns–Manville Corp. v. Guardian Indus. Corp.,* 718 F.Supp. 1310, 1315, 13 USPQ2d 1684, 1687 (E.D.Mich.1989). Industry practice and custom must likewise be considered in the determination of the royalty base. *Studiengesellschaft Kohle m.b.H. v. Dart Indus., Inc.,* 862 F.2d 1564, 1566, 9 USPQ2d 1273, 1278 (Fed. Cir.1988). *See Stickle,* 716 F.2d at 1562, 219 USPQ at 386 (damages awarded as a lump sum in lieu of royalties); *Hanson,* 718 F.2d at 1082–83, 219 USPQ at 685 (royalties calculated based upon the capacity of an infringing machine rather than on actual use of that machine).

■ 8. Where industry custom and practice contemplates an up-front payment followed by running royalties, the Court has discretion to formulate its compensatory damages award accordingly. *See de Graffenried v. United States,* 25 Cl.Ct. 209, 24 USPQ2d 1594 (Ct.Cl.1992) ($50,000 up-front payments plus running royalties); *Johns Manville Corp. v. Guardian Industries Corp.,* 718 F.Supp. 1310, 13 USPQ2d 1684 (E.D.Mich.1989) ($9.6 million up front payment plus 10% running royalty rate); *Orthman Mfg., Inc. v. Chromalloy American Corp.,* 512 F.Supp. 1284, 210 USPQ 364 (C.D.Ill.1981) ($10,000 up front plus royalties); *Molinaro v. Burnbaum,* No. 69–762, 1978 WL 21376, 201 USPQ 150 (D.Mass. November 22, 1978) ($5,000 up-front payment plus running royalties).

■ 9. Where, as here, the current patent owner purchased the patent, the value of the consideration given in exchange for the patent may be relevant to the determination of a reasonable royalty because it may bear on the amount that might have been accepted by a prudent patentee who was engaging in a

hypothetical licensing negotiation. Where the value of the consideration given can be gleaned from two separate documents that were part of the same transaction, the Court, applying general contract principles, should interpret the documents together notwithstanding any integration clauses in the documents. *See* 4 Samuel Williston, *Williston on Contracts* § 628 (3d ed. 1961) ("Even where a writing does not refer to another writing, if such other writing was made as part of the same transaction, the two should be interpreted together.") (citing cases).

10. The determination of a damage award is not an exact science. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863, 226 USPQ 402, 409 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). "The trial court is required to approximate, if necessary, the amount to which the patent holder is entitled." *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327, 5 USPQ2d 1255, 1260 (Fed.Cir.1987).

■ 11. Under 35 U.S.C. § 287(a), patentees who make or sell items under their own patents must give constructive notice to potential infringers of the existence of the patents either by marking the patented items or by notifying the infringers of the infringement. If the patentee chooses notification, the notification must be "an affirmative act on the part of the patentee which informs the defendant of his infringement," such as a letter specifically referring to the accused device. *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187, 30 USPQ2d 1462, 1469 (Fed.Cir.1994). "In prescribing the means by which a patentee 'may give notice', section 287(a) generally requires that the patented articles made or sold under the patentee's authority be marked, or failing that *each* infringer is provided with actual notice of the infringement." *Maxwell v. J. Baker, Inc.*, 805 F.Supp. 728, 732, 26 USPQ2d 1241, 1244 (D.Minn.1992) (citing *General Elec. Co. v. Sciaky Bros., Inc.*, 304 F.2d 724, 726 (6th Cir.1962) (citations omitted) (emphasis added); *Lemelson v. Fisher Price Corp.*, 545 F.Supp. 973, 974 (S.D.N.Y. 1982)). *See also Ceeco Machinery Mfg., Ltd. v. Intercole, Inc.*, 817 F.Supp. 979, 986 (D.Mass.1992) ("Actual notice, by contrast, alerts a *specific defendant* that the patentee is claiming infringement as to a specific item.") (emphasis added).

**B. Prejudgment Interest**

■ 12. Courts ordinarily award prejudgment interest to the prevailing patent owner in patent infringement cases. *General Motors Corp. v. Devex*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211, 217 USPQ 1185, 1188 (1983). Prejudgment interest should be awarded for the time period extending from the date infringement began to the date of the judgment. *Id.*

■ 13. Prejudgment interest is to be applied to the actual compensatory damages, not to any enhanced portion. *Underwater Devices, Inc. v. Morrison–Knudsen Co., Inc.*, 717 F.2d 1380, 219 USPQ 569, 576 (Fed.Cir. 1983).

■ 14. The rate of prejudgment interest and whether it should be compounded are matters left to the trial court's discretion. *Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 24, 223 USPQ 591, 600 (Fed.Cir.1984). The trial court is to exercise this discretion in light of the goal of prejudgment interest, which is to place the patent owner in as good a position as he would have occupied had the infringer entered into a reasonable royalty agreement. *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969, 1 USPQ2d 1191, 1194–95 (Fed.Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987).

**III. ENHANCED DAMAGES.**

**A. Enhanced Damages Due To Willful Infringement**

■ 15. Section 284, Title 35, provides that a patentee may recover from an infringer increased damages up to three times the amount of actual damages. Courts award increased damages when infringement is found to be "willful." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826, 23 USPQ2d 1426, 1435 (Fed.Cir.1992).

■ 16. Whether infringement is willful is a question of fact. *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 8 USPQ2d 1323 (Fed. Cir.1988). The decision whether to enhance damages following a finding of willfulness is committed to the trial court's discretion. *Amsted Indus.*, 24 F.3d at 183, 30 USPQ2d at 1466.

■ 17. Willfulness is shown when, upon consideration of the totality of the circumstances, clear and convincing evidence establishes that the infringer acted in disregard of the patent and had no reasonable basis for believing it had a right to engage in the infringing acts. *Transmatic, Inc. v. Gulton Industries, Inc.*, 53 F.3d 1270, 1279 (Fed.Cir. 1995); *American Medical Sys., Inc. v. Medical Engineering, Corp.*, 6 F.3d 1523, 1530, 28 USPQ2d 1321, 1325 (Fed.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994). There is no requirement that the patentee show "bad faith." *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 229 USPQ 525 (Fed.Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986). Instead, "[t]he paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp.*, 970 F.2d at 826, 23 USPQ2d at 1435 (proceeding to list nine factors that courts have considered in determining willfulness).

■ 18. Willfulness almost invariably involves an inquiry into whether the infringer satisfied the affirmative duty of due care to avoid infringement of the known patent rights of others. *Electro Medical Systems, S.A. v. Cooper Life Sciences*, 34 F.3d 1048, 1056, 32 USPQ2d 1017, 1023 (Fed.Cir.1994); *L.A. Gear Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1127, 25 USPQ2d 1913, 1920 (Fed. Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). Infringers satisfy this duty by presenting evidence that they obtained a competent exculpatory opinion of counsel before engaging in the infringing acts and that they relied upon the advice contained in that opinion. *Amsted Indus.*, 24 F.3d at 181; *Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1389–90, 219 USPQ 569, 576 (Fed.Cir.1983).

19. "Possession of a favorable opinion of counsel is not essential to avoid a willfulness determination; it is only one factor to be considered, albeit an important one." *Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056 (Fed.Cir. 1994); *see also Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1579, 230 USPQ 81, 91 (Fed.Cir.1986) (though it is an important consideration, the absence of an opinion of counsel alone does not mandate an ultimate finding of willfulness).

20. For example, if the issues of patent infringement or patent validity are closely litigated, the court should be "more reluctant to impose punitive damages." *Yoder Bros., Inc. v. California–Florida Plant Corp.*, 537 F.2d 1347, 1383–84, 193 USPQ 264 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Electro Medical Systems*, 34 F.3d at 1057 (that infringement and invalidity were close questions was factor weighing against willfulness finding). *See also Eltra Corp. v. Basic, Inc.*, 599 F.2d 745, 757–58, 202 USPQ 630 (6th Cir.1979), *cert. denied*, 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 308 (1979) ("The existence of honest doubt concerning the validity of a patent precludes a finding of willfulness.").

■ 21. An exculpatory opinion of counsel is not competent, and hence cannot serve as a reasonable basis for an infringer's belief that he had the right to continue his infringing acts, where there is no evidence that the attorney ever consulted or even ordered the patent's prosecution history. *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 11 USPQ2d 1321 (Fed.Cir.1989), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990).

22. Where, as here, an assertion of privilege has been made, "[a]n accused infringer ... should not ... be forced to choose between waiving the privilege in order to protect itself from a willfulness finding, in which case it may risk prejudicing itself on the question of liability, and maintaining the privilege, in which case it may risk being found to be a willful infringer if liability is found." *Quantum Corp. v. Tandon Corp.*, 940 F.2d 642, 644 (Fed.Cir.1991).

23. The court may consider the litigation conduct of the infringer and the litigation tactics of the infringer's counsel as factors in determining willfulness. *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.,* 781 F.2d 198, 201, 228 USPQ 367, 369 (Fed.Cir. 1986). The decision whether to increase damages "provides an opportunity for the trial court to balance equitable concerns as it determines whether and how to recompense the successful litigant." *Id.*

24. Litigation conduct such as burdening the court with meritless motions has justified findings of willfulness. *Amsted Indus.,* 24 F.3d at 184, 30 USPQ2d at 1466. Likewise, where the infringer employs "a 'shotgun' approach to the defense of [a] patent suit, asserting and pursuing every conceivable defense, only to concede many of them during oral argument in the trial court," a finding of willfulness may be justified. *Jurgens v. McKasy,* 927 F.2d 1552, 1562, 18 USPQ2d 1031, 1039 (Fed.Cir.), *cert. denied,* 502 U.S. 902, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991).

### B. *Exceptional Case*

25. Section 285, Title 35, provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."

26. Whether a case is exceptional is a question of fact. *L.A. Gear, Inc.,* 988 F.2d at 1128, 25 USPQ2d at 1921. A decision whether to award attorney fees based upon a finding that a case is exceptional is committed to the discretion of the trial court. *Amsted Indus.,* 24 F.3d at 184, 30 USPQ2d at 1467.

27. An express finding of willful infringement is a sufficient basis for classifying a case as exceptional. *Del Mar,* 836 F.2d at 1329, 5 USPQ2d at 1262; *Bott v. Four Star Corp.,* 807 F.2d 1567, 1 USPQ2d 1210 (Fed.Cir.1986); *Great Northern Corp. v. Davis Core & Pad Co., Inc.,* 782 F.2d 159, 228 USPQ 356 (Fed.Cir.1986); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 657, 225 USPQ 985 (Fed.Cir.1985).

28. Bad faith displayed in the pretrial or trial stages by the infringer's counsel or by the infringer, which is relevant to willfulness, may also be a factor in determining that a case is exceptional. *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 230 USPQ 81 (Fed.Cir.1986).

### IV. *CONCLUSION*

Based on the findings and conclusions set forth above, the Court finds that Defendants did not willfully infringe Plaintiffs' '650 patent. Accordingly, Plaintiffs are entitled to a reasonable royalty in the amount of $233,998 and prejudgment interest in an amount to be calculated and submitted by the parties to the Court in accordance with the Court's findings. Once the parties have submitted the figure for prejudgment interest of 7.5% compounded annually on the $100,000 lump sum payment starting from July 1, 1991 and have added the other interest amounts for a total interest figure, the Court will enter a final judgment entry in favor of Plaintiffs and against Defendants.

It is so ORDERED.